UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

TERRELL HARRIS,

                Plaintiff,

v.                                          Case No. 24-CV-286

CHRISTOPHER PEGELOW, *et al.*,

                Defendants.

---

### DECISION AND ORDER

---

Plaintiff Terrell Harris, who is incarcerated and representing himself, brings this lawsuit under 42 U.S.C. § 1983. Harris was allowed to proceed on an Eighth Amendment claim of deliberate indifference to his medical needs because the defendants allegedly failed to provide appropriate medical care for his asthma and pulmonary embolism. The defendants filed a motion for summary judgment, which is fully briefed and ready for a decision. (ECF No. 44.) The parties have consented to the jurisdiction of a magistrate judge. (ECF Nos. 6, 16, 34.)

### FACTS

At all times relevant Harris was incarcerated at the Milwaukee Secure Detention Facility (MSDF). (ECF No. 48, ¶ 1.) Defendant Christopher Pegelow was a correctional sergeant at MSDF, and Dr. Jospeh McLean was a primary care physician there. (*Id.*, ¶¶ 2-3.)

*Dr. McLean's Care Prior to Asthma Attack*

Harris has moderate asthma and a history of pulmonary embolus. (ECF No. 48, ¶¶ 8, 11.) Typically, people with moderate asthma use a corticosteroid inhaler for continuous mitigation of symptoms and a quick reliever inhaler when experiencing symptoms. (*Id.*, ¶ 9.) People who suffer from pulmonary embolism take an anticoagulant (blood-thinner) for prevention. (*Id.*, ¶ 12.) Asthma and pulmonary embolism are distinct conditions and "[o]ne does not cause the other, but either can make the symptoms of the other worse." (*Id.*, ¶ 13.)

During his intake into MSDF on July 11, 2023, Harris did not disclose to the intake nurse any current prescriptions. (ECF No. 48, ¶ 14.) On July 15, 2023, a non-defendant nurse not identified in the record examined Harris for "abdominal complaints." (*Id.*, ¶ 15.) The nurse reviewed the medical records noting medications Harris had taken previously and consulted with Dr. McLean, who was on call that day. (*Id.*) As a result of that consult, Dr. McLean ordered an albuterol inhaler that Harris could keep to use up to four times a day when he was experiencing shortness of breath. (*Id.*)

On July 20, 2023, Dr. McLean conducted a routine physical of Harris. (ECF No. 48, ¶ 17.) The defendants assert that during the physical Harris and Dr. McLean discussed difficulties with bowel movements, excessive sweating, and STD testing. (*Id.*) Dr. McLean asked Harris about "hematology related issues", and the defendants assert that Harris said he did not have any such issues. (*Id.*) Dr. McLean also asked about "any respiratory concerns", and the defendants state that Harris "denied cough, wheezing,

2

shortness of breath, obstructive sleep apnea, or other respiratory issues." (*Id.*) Dr. McLean also noted that Harris was regularly using albuterol. (*Id.*)

Harris disputes Dr. McLean's characterization of his physical exam. (ECF No. 86, ¶ 17.) Harris states that Dr. McLean was "very aware" of his history with blood clots and asthma because Harris both told Dr. McLean about it and because Dr. McLean should have read his medical records and would have noted it. (*Id.*) Harris also states that he never received an inhaler, so Dr. McLean stated he would re-order it. (*Id.*)

Regarding blood-thinner, Dr. McLean states that Harris did not ask for one, and he noted that another DOC health care provider (unidentified in the record) did not renew an order for blood-thinner medication on May 10, 2023, because Harris had a history of not taking the medication. (ECF No. 48, ¶ 19.)

On August 31, 2023, Dr. McLean renewed Harris's albuterol order, which was good until December 26, 2023. (ECF No. 48, ¶ 21.) The defendants assert that Dr. McLean did not see Harris again until December 18, 2023, and at that appointment Harris informed Dr. McLean that he had a history with pulmonary embolus and that he had previously been told by doctors that he should be on blood-thinners "for life." (*Id.*, ¶ 22.) Harris specifically indicated that he used to take Rivaroxaban (a blood-thinner) and asked if he could be placed back on it. (*Id.*) Dr. McLean examined Harris and noted that his "lungs were clear and that he was breathing easily." (*Id.*) Dr. McLean then placed a Non-Formulary Drug Request for Rivaroxaban, which the medical director approved. (*Id.*, ¶ 24.) Harris states that he spoke to Dr. McLean about his pulmonary

3

embolism before December 18, 2023, but he does not provide dates or details as to when. (ECF No. 86, ¶ 22.)

On December 21, 2023, Harris was examined by a non-defendant, unidentified nurse in the Health Services Unit (HSU) for unrelated issues. (ECF No. 48, ¶ 24.) At the visit his oxygen saturation levels in his blood were recorded at 96 percent and his respirations were "Unlabored, Quiet." (*Id.*, ¶¶ 25-26.) Normal oxygen saturation is between 95-100 percent. (*Id.*, ¶ 26.) The next day, Dr. McLean renewed Harris's order for an albuterol inhaler. (*Id.*, ¶ 27.) Dr. McLean also placed an order for Rivaroxaban with instructions to have Harris start taking it on December 25, 2023. (*Id.*, ¶ 28.) The medical distribution records show that Harris refused to take the Rivaroxaban on December 25 and 26, 2023. (*Id.*, ¶ 29.) Harris states that he did not take it because it was not in stock on those days. (ECF No. 86, ¶ 29.)

*December 27, 2023, Asthma Attack*

On December 27, 2023, Harris was housed in 6 South housing, C unit, cell C21. (ECF No. 48, ¶ 33.) Pegelow was at the Sergeant's Station, and Harris used his in-cell intercom to tell Pegelow "that he was experiencing chest pains and breathing difficulties." (*Id.*, ¶ 40.) Pegelow responded that he would contact HSU. (*Id.*, ¶ 41.) The defendants state that Pegelow called HSU and was sent to voice mail. (*Id.*, ¶ 42.) Pegelow left a message describing the medical issue. (*Id.*) Pegelow then told Harris that he was waiting to hear from HSU. (*Id.*, ¶ 43.) Harris notes that there is no documentary evidence that Pegelow called HSU. (ECF No. 86, ¶ 42.)

Fifteen minutes later an unidentified correctional officer came to Harris's cell to pick up his meal tray. (ECF No. 48, ¶ 44.) Shortly thereafter, Harris again used his intercom to call the Sergeants' Station. (*Id.*, ¶ 45.) It is undisputed that at approximately 4:15 p.m. Pegelow stopped the nurse on her medication distribution rounds and explained Harris's medical issues. (*Id.*, ¶ 46.) After the nurse completed her rounds, she stopped at Harris's cell and spoke with him. (*Id.*, ¶ 47.) Harris was then checked on twice between 5:00 p.m. and 5:45 p.m. by correctional officers on their rounds. (*Id.*, ¶¶ 49-50.)

At approximately 6:20 p.m. Harris again used his intercom to call the Sergeants' Station to report breathing issues. (ECF No. 48, ¶ 51.) Harris was then checked on two more times between 6:30 p.m. and 7:15 p.m. (*Id.*, ¶¶ 52-53.) Harris called the Sergeant's Station twice more to report breathing issues between 7:30 p.m. and 7:45 p.m. (*Id.*, ¶¶ 54-55.) At approximately 8:00 p.m., Pegelow reached someone from HSU and explained Harris's medical issue. (*Id.*, ¶ 56.) A nurse then examined Harris in the dayroom. (*Id.*, ¶¶ 57-58.) When the exam was done, Harris walked back to his cell while the nurse left the unit for a short time. (*Id.*, ¶ 59.) When the nurse returned five minutes later, Harris was escorted to the HSU; he walked to the HSU without assistance. (*Id.*, ¶ 60.)

In total, the defendants assert that "Pegelow called HSU four or five times and left repeated messages". (ECF No. 48, ¶ 77.) He was also monitoring Harris through the intercom, and did not see signs that Harris was experiencing an emergent situation. (*Id.*, ¶¶ 78-89.) Harris states that he does not believe that Pegelow called HSU or that Pegelow was monitoring him over the intercom. (ECF No. 86, ¶¶ 77-82.)

At approximately 8:15 p.m., Harris's oxygen saturation levels were at 94 percent, and he had wheezing and "moderate shortness of breath." (ECF No. 48, ¶ 61.) The HSU nurse provided him a DuoNeb, which is a treatment used during an asthma attack that "works to open the airways and reduce inflammation in the lungs to assist in breathing." (*Id.*) At 8:35 p.m., Harris's oxygen saturation levels were rechecked and were at 74 percent. (*Id.*) An ambulance was called to take him to the hospital. (*Id.*) Harris was also given an "NRB Mask (non-rebreather mask), which is a medical device (mask) that delivered oxygen but still allowed [Harris] to breathe on his own." (*Id.*) At 8:52 p.m., Harris's oxygen saturation levels were rechecked and were at 100 percent. (*Id.*) At 8:55 p.m., Harris's oxygen saturation levels were again rechecked and were at 98 percent. (*Id.*) When Harris's levels were checked again at 9:05 p.m., they were at 99 percent. (*Id.*) At 9:07 p.m., the ambulance arrived and took Harris to the emergency room at Mount Sinai in Milwaukee, Wisconsin. (*Id.*, ¶¶ 61-63.)

While in the emergency room Harris had a CT scan to look for a pulmonary embolism. (ECF No. 48, ¶ 66.) The CT scan did not indicate a pulmonary embolism. (*Id.*) Harris's asthma was treated, and the treating ER doctor (not a defendant) did not recommend any additional steroid treatment, which indicates that Harris did not suffer a severe asthma attack. (*Id.*, ¶¶ 71-73.)

Dr. McLean then saw Harris on December 28, 2023, for a follow-up appointment. (ECF No. 48, ¶ 74.) At that appointment Harris requested a steroid inhaler. (*Id.*) Even though the ER doctor had not recommended a steroid inhaler, Dr. McLean placed an order for one and put in an order for a course of Prednisone. (*Id.*, ¶ 75.) The defendants

6

assert that Dr. McLean did not learn that Harris needed a steroid inhaler until that day. (*Id.* at 74.) Harris disputes this, stating he told Dr. McLean on several occasions that he needed a steroid inhaler. (ECF No. 86, ¶ 74.) However, Harris does not provide dates and times when he said this to Dr. McLean. (*Id.*)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment a party cannot just rely on his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of

7

fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Harris claims that Dr. McLean violated his Eighth Amendment rights by failing to treat both his asthma and pulmonary embolism prior to the December 27, 2023, asthma attack. Harris claims that Pegelow violated his Eighth Amendment rights when he delayed in getting Harris medical attention on December 27, 2023.

*Claims against Dr. McLean*

A prison official violates the Eighth Amendment where he is deliberately indifferent "to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "To state a cause of action, a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). Also, "the plaintiff must prove that the defendant's deliberate indifference actually *caused* his injury." *Hunter v. Mueske*, 73 F.4th 561, 565 (7th Cir. 2023). (citing *Roe v. Elyea*, 631 F.3d 843, 864 (7th Cir. 2011)).

"A medical need is sufficiently serious if the plaintiff's condition 'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Roe*, 61 F.3d at 857 (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). Regarding deliberate indifference, a plaintiff must demonstrate "that an official *actually* knew of and disregarded a

substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (emphasis in original). The plaintiff also "must show more than mere evidence of malpractice." *Id.* The plaintiff must show that the prison official's choices "were so 'significant a departure from accepted professional standards or practices' that it is questionable whether they actually exercised professional judgment." *Stallings v. Liping Zhang*, 607 Fed. Appx. 591, 593 (7th Cir. 2015) (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)).

The parties dispute whether Harris suffered an objectively serious medical condition, but the dispute is immaterial because no reasonable factfinder could conclude that Dr. McLean was deliberately indifferent.

Regarding Harris's asthma, it is undisputed that Dr. McLean prescribed Harris an albuterol inhaler after the nurse called him on July 15, 2023, partly to inform him that Harris had been prescribed an inhaler in the past. It is also undisputed that Dr. McLean continuously renewed Harris's albuterol inhaler, including on December 22, 2023, shortly before Harris's asthma attack. Harris mainly alleges that Dr. McLean failed to treat his asthma because Dr. McLean never provided him with a steroid inhaler and Harris never received the albuterol inhaler. However, Harris provides no evidence demonstrating that Dr. McLean was aware that Harris wanted a steroid inhaler prior to December 27, 2023. Similarly, the only evidence Harris offers that he told Dr. McLean he did not receive an inhaler was the conversation they had at Harris's July 20, 2023, appointment. And it is undisputed that Dr. McLean promptly re-ordered the inhaler. Harris provides no additional evidence of steps he took to inform Dr. McLean or other HSU staff that he did not receive his inhaler after July 20. As such, the undisputed

9

evidence shows that Dr. McLean was unaware of these issues. Dr. McLean cannot be held liable for ignoring issues he did not know about.

Turning to Harris's pulmonary embolism, Harris fails to establish that Dr. McLean's failure to provide blood-thinners before December 18, 2023, caused his December 27, 2023, asthma attack. The CT scan taken at the emergency room on December 27 did not indicate any pulmonary embolism. As such, having blood thinners before December 27, 2023, would not have prevented the asthma attack. Harris also did not introduce any evidence indicating that he was harmed or injured by the lack of blood thinners in any other manner. As a result, Harris did not meet the requirement that he suffered an objectively serious harm as a result of not receiving blood thinners.

Because no reasonable factfinder could conclude that Dr. McLean acted with deliberate indifference towards Harris's asthma and pulmonary embolism, summary judgment is granted in Dr. McLean's favor.

*Claim against Pegelow*

Harris asserts that Pegelow did not timely get him medical attention after he alerted Pegelow that he was experiencing chest pain and shortness of breath on December 27, 2023. Harris disputes whether Pegelow called HSU and asserts he did not monitor him through the intercom system, but he offers no evidence to support these assertions other than his own belief. "It is well established that in order to withstand summary judgment, the non-movant must allege specific facts creating a genuine issue for trial and may not rely on vague, conclusory allegations." *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017).

However, even if Pegelow did not repeatedly call HSU as Harris implies, Harris still fails to demonstrate that Pegelow acted with deliberate indifference. It is undisputed that the nurse passing out medication spoke with Harris and did not consider his condition emergent. Non-medical professionals, like security officers, are "entitled to rely on the medical professionals' determination[s]" concerning a prisoner's health care and recommended treatment. *McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013).

Also, Harris cannot demonstrate that the three-hour period between when he reported his health issues and when he received treatment caused his condition to worsen. "A delay in treatment may show deliberate indifference if it exacerbated the inmate's injury or unnecessarily prolonged his pain." *Perez v. Fenoglio*, 792 F.3d 768, 777-778 (7th Cir. 2015.) "[D]elays are common in the prison setting with limited resources, and whether the length of delay is tolerable depends upon the seriousness of the condition and the ease of providing treatment." *Petties* 836 F.3d at 730.

Harris offers no evidence that the delay unnecessarily aggravated his condition or needlessly prolonged his pain. Harris needed to demonstrate that he suffered from "serious but *avoidable* pain." *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027 (7th Cir. 2019) (emphasis in original, citations omitted). The undisputed facts show that, once Harris was in the HSU and received the DuoNeb treatment and the NRB mask, his oxygen saturation levels stabilized. Because Harris did experience a brief dip in oxygen saturation levels while in the HSU, out of an apparent abundance of caution he

11

was sent to the emergency room. There he was treated and sent back to MSDF after a few hours with no additional treatment instructions or recommendations.

Harris has provided no evidence of lasting damage because of the short delay in treating his asthma attack. At most, he shows he experienced a few additional hours of discomfort, which is not enough to prove a claim of deliberate indifference. Because no reasonable factfinder could conclude that the delay caused by Pegelow resulted in exacerbating Harris's condition, summary judgment is granted in Pegelow's favor.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted. The defendants also argued that they were entitled to qualified immunity, but because the court found in their favor on the merits it does not need to address the qualified immunity argument. Because there are no remaining claims, the case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (ECF No. 44) is **GRANTED.**

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests

an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 2nd day of September, 2025.

BY THE COURT

*William E. Duffin*

WILLIAM E. DUFFIN
United States Magistrate Judge